**George L. GIPSON, Plaintiff,**

v.

**KAS SNACKTIME CO., A DIVISION OF BORDEN, INC., Defendant.**

**No. 4:91CV1827SNL.**

United States District Court,
E.D. Missouri,
Eastern Division.

Dec. 21, 1994.

Michael J. Hoare, Michael J. Hoare, A Professional Corp., St. Louis, MO, for George L. Gipson.

Thomas M. Hanna, President, McMahon and Berger, St. Louis, MO, for KAS Snacktime Co., a subsidiary of Borden, Inc.

## MEMORANDUM OPINION

LIMBAUGH, District Judge.

Plaintiff filed this action alleging that he was harassed and demoted on the basis of race. Plaintiff alleges that his immediate supervisor subjected him to harassment and verbal abuse, unfairly evaluated his job performance, unfairly disciplined him, and was instrumental in the final decision to demote him solely due to the plaintiff's race. Plaintiff further alleges that defendant's management personnel were aware of the racial harassment and failed to take proper steps to eliminate it. Plaintiff has brought suit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* This case was tried before this Court sitting without a jury on October 7–8 and 12–13, 1993.[1] All objections to exhibits that were taken with the case are now overruled, and all exhibits offered into evidence at trial are received into evidence. This Court, having now considered the pleadings, the testimony of the witnesses, the depositions testimony, the documents in evidence and stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

Plaintiff George L. Gipson is a citizen of the United States who resides within the Eastern Division for the Eastern District of Missouri. Plaintiff Gipson is an "employee" within the meaning of Title VII. Defendant Borden, Inc. is a corporation duly organized and existing under the law and is an "employer" within the meaning of Title VII.[2]

Plaintiff was first employed by Fairmont Foods in 1972 as a Route Salesman. He was recruited for the job by Tony Kern, another Route Salesman with whom he had previously worked at Colonial Bakery. He was promoted over the next fourteen (14) years to Area Sales Manager, District Sales Manager (hereinafter abbreviated to DSM), and finally Regional Sales Manager (hereinafter abbreviated to RSM) in the KAS Snacktime division. During this time period, Fairmont

---

1. This Court's earlier findings in this case determined that the plaintiff's cause of action arose prior to the effective date of the Civil Rights Act of 1991; consequently, plaintiff's Title VII action was to be tried before the Court sitting without a jury.

2. Although KAS Snacktime is named as the "defendant" in this case, it appears that the parties agree (and the Court concurs) that Borden, Inc. is the real party in interest, i.e. the defendant. KAS Snacktime was a recent acquisition of Borden during the relevant time period, and appears to have been at all times considered to be a division of Borden, Inc. In fact, it is now known as Borden Snacks, a division of Borden, Inc.

Foods was acquired by Culbro Corporation. In 1986, as a RSM for the St. Louis region, plaintiff reported to Division Sales Manager Fred Mainer, who was headquartered in Centralia, Illinois. In July 1987, following Mainer's retirement, Culbro hired Rick Brank. Unlike his predecessor, Brank was headquartered in St. Louis in the same building as the plaintiff.

In August 1987, Borden acquired the KAS Snacktime division from Culbro. Plaintiff and Brank retained their same positions following the acquisition. However, with a change in ownership came a dramatic change both in management organization and in management style.

A Regional Sales Manager is responsible for major accounts. S/he supervises the operation and expenses of five to six District Sales Managers. The Regional Sales Manager trains the District Sales Managers. The District Sales Managers train and supervise six to eight Route Salespersons. A Route Salesperson calls on customers and is primarily directly responsible for the presence of the product in the store (i.e. stock the shelves, rotate stock, remove stale product, arrange the display of the product).

As stated before, prior to the acquisition of KAS Snacktime by the defendant, plaintiff reported to the Division Sales Manager (Fred Mainer) in Illinois. Mainer reported to the Vice–President in Charge of Sales (Pat Miller) located in Indianapolis. After the acquisition, plaintiff reported to the Division Sales Manager (Rick Brank) in St. Louis. Brank reported to Pat Miller. However, in May 1988 Pat Miller became Vice–President of the Division, and Bruce Cutting became Vice–President in Charge of Sales.

There are three regions in the St. Louis area: J.C. Kupp was the RSM for the Kennett, Missouri region (Region 1); Plaintiff was the RSM for the St. Louis, Missouri region (Region 2); and Tony Kern was the RSM for the Farmington, Missouri region (Region 3). Plaintiff was the only black RSM during the relevant time period.

Region 2 and Region 3 are dissimilar marketing regions.[3] Region 2 is an urban market covering West Central Illinois, and the Eastern, Mid–Central, and Northeastern portions of Missouri (including Metropolitan St. Louis). Region 3 is a rural market covering Northern Arkansas, Southern Missouri, Northwestern Kentucky, Northwestern Tennessee, Southern Illinois, and parts of Eastern Oklahoma and Eastern Kansas. In Region 2, the five or six major accounts were all within the metropolitan St. Louis area; and account calls were typically only a few miles or minutes apart. In Region 3, the major accounts were spread across five (5) states; and account calls were typically thirty or more miles apart. Inventory maintenance differed between the two regions. In Region 2, there was a central location for inventory distribution to the Route Salesman, DSMs, or the RSM. The St. Louis RSM was responsible for the maintenance and operation of the warehouse. Region 3 was considered to be a "field operation"; the Route Salesmen were responsible for maintaining their own inventory via personalized inventory storage or "bins". Both plaintiff and Tony Kern, as RSMs, had identical job descriptions except that plaintiff was also responsible for the management and operation of the St. Louis warehouse facility.

The management style under Fairmont Foods and Culbro was a "laid-back" style. Prior to 1987 there was little competition in the snack food business. In 1987, competition began to heat up. Anheuser–Busch had begun to market snacks through its Eagle Brand company; and Frito–Lay was actively marketing its products in the stores and through mass advertising. Borden decided to pursue the market in an aggressive manner. It directed upper management at KAS Snacktime to take a more direct approach to marketing their products. This was characterized by a "three-step marketing ap-

---

3. Plaintiff's lawsuit primarily focuses upon alleged discrimination regarding his supervision in comparison to Tony Kern, the RSM for Region 3. Plaintiff alleges that although he and Kern had the same job description, they were treated differently. Specifically, plaintiff claims that al-

though he had more sales and lower expenses than Kern, plaintiff was constantly berated by management (whereas Kern was not) and given a lower performance rating than Kern. Given the posture of the plaintiff's lawsuit, it is necessary for the Court to compare Regions 2 and 3 only.

proach": initiate the account and familiarize the buyer with the product; service the account (stock shelves, rotate stock, remove stale stock, suggest and monitor advertising campaigns, highlight promotions and specials on certain products); and provide active follow-up for the account (maintain regular personal contact with the buyer). Borden's emphasis was on active management of accounts; it expected its people to make things happen, not wait around for something to happen. Borden management emphasized direct ("hands on") supervision of subordinates. It believes that there is a direct correlation between store appearance and sales with the management of route salespeople and the DSMs. A main focus was on having the DSMs "route ride" two to three times a week with their sales staff. Borden believes that if a DSM regularly rides with the sales staff and observes that person making calls and marketing defendant's products, problems could be averted and sales performance improved. It further believes that the RSM should spend less time calling on major accounts via the telephone, and more time making personal contact with these accounts.

Plaintiff and Rick Brank began their business relationship in July 1987. From the beginning, it appeared not to be exactly a match made in heaven. At their initial meeting, Plaintiff presented Brank with a jacket with Brank's name and the defendant's logo on it. Brank hung the jacket up and never removed it, nor did he ever wear it. They also discussed the future of one of plaintiff's DSMs, Lionel Harris. Lionel Harris was the only black DSM at the time. Plaintiff testified that Brank referred to Harris as the "fat black guy with glasses" and that Brank wanted him fired because Harris did not fit into Brank's plans.[4] Plaintiff refused to fire Harris because he felt that Harris was one of his top DSMs.

Shortly thereafter, plaintiff and Brank went on a market tour of stores in plaintiff's region. Plaintiff testified that Brank physically threatened him for entering one of the stores ahead of Brank. In early August 1987 plaintiff failed to attend an 8:00 a.m. meeting with Brank. Plaintiff was in Granite City, Illinois at the time and did not arrive at the office in St. Louis until 9:30 a.m. Plaintiff testified that he called in to report that he would be unable to attend the meeting. Plaintiff further testified that Brank again physically threatened him for his absence.

In September 1987, plaintiff was evaluated for job performance between January 1987 through August 1987. Brank rated plaintiff in seven (7) areas of accountability: Accountability # 1—Development and Attaining the Sales Forecast; # 2—Expense Planning and Control; # 3—Selection and Development of Sales People; # 4—Implementation of District Sales Managers and Route Salesperson Training Program; # 5—Maintenance of Rapport with Major Customers; # 6—Organization of the Region and Deployment of People, Equipment and Materials Within the Region to Optimize[5] Sales Penetration and to Provide the Best Service to the Customer; and # 7—Implementation of Advertising and Promotional Programs Established at Headquarters. Plaintiff was rated Competent minus (C−) for Accountability # 1 because his sales were behind plan; C− for Accountability # 2 because his expense planning and control were behind plan; Fair minus (F−) for Accountability # 3 because he had not established a route riding program for his DSMs and they had averaged less than one day per week riding routes; Fair (F) for Accountability # 4 because his route salesperson had not completed training; F for Accountability # 5 because the plaintiff had not called on regional accounts in accordance with defendant's required frequency; Competent (C) for Accountability # 6; and F for

---

4. The Court notes that it is at a disadvantage as to determining the credibility of testimony regarding alleged statements by Brank because neither party deposed Brank or offered his testimony at trial as a witness. Consequently, the Court will give due consideration to Brank's alleged statements; however, consideration is also given to the fact that in most instances only the plaintiff witnessed these alleged statements.

5. Both plaintiff's Exhibit 4 and Defendant's Exhibit A largely obliterate a word which appears to be either "optimal" or "optimum" or "optimize"; the Court presumes that the word is "optimize" given the context of the sentence.

Accountability # 7. Brank's overall rating for the plaintiff was Fair (F), the second lowest rating available. As a result of this rating, plaintiff was denied a wage increase.

Brank also completed Tony Kern's January 1987—August 1987 job performance evaluation. He rated Kern as follows: Accountability # 1—C; Accountability # 2—F; Accountability # 3—S; Accountability # 4—S; Accountability # 5—D; Accountability # 6—S; and Accountability # 7—C. Kerns overall rating was sufficiently high enough to earn him a 6% wage increase.

As part of his evaluation of the plaintiff, Brank submitted a written narrative of what he considered to be plaintiff's weaknesses. He found that although plaintiff possessed a thorough knowledge of the defendant's business, he felt that the plaintiff's mediocre job performance was due to three factors: poor communication skills; failure to complete assignments as requested; and failure to take responsibility for his actions. Brank noted that the plaintiff tended not to answer questions directly and to interrupt ongoing conversations, that the plaintiff had failed to consolidate routes as requested to do so over nine (9) months earlier; and that the plaintiff consistently blamed others for his own failures or problems in his region. Brank believed that "George's overall performance rating will be significantly improved once he improves his communication skills."

Brank then developed an action plan "[i]n order for George to improve his performance." This (6) months "plan of action" identified specifically seven (7) objectives that plaintiff was to achieve within the following six (6) months. These objectives were as follows: 1) Attend all meetings and be there at the appointed time; 2) Call on each headquarter account at a frequency of every two weeks; 3) Spend four days per week in the field. Write points for your attention after each contact; 4) Complete all tasks assigned on a timely basis; 5) Have preplanning before each promotion period to set objectives and role play presentation; 6) Attend a class on communication skills for managers; and 7) Schedule one meeting per week with your Division Sales Managers to discuss current operations. A formal evaluation was to take place after ninety (90) days had passed.

Shortly after his own job performance evaluation was completed, plaintiff completed a job performance evaluation for Lionel Harris. Plaintiff considered Harris to be one of his top DSMs. He recommended that Harris receive a wage increase; however Brank refused to approve the recommendation and put Harris on a ninety (90) day performance plan. Harris submitted a written protest in which he blamed the denial of his wage increase on race discrimination. This written protest prompted a visit to St. Louis by Charles Kester, Director of Human Resources for the defendant. When Kester visited St. Louis on the Harris matter, he encountered the plaintiff. Plaintiff told Kester that he believed that both he and Harris were being treated unfairly; however, he did not qualify his statement as racial discrimination. Kester told plaintiff to send him a written account of his grievances.

Meanwhile, on October 26, 1987 Brank sent plaintiff a memorandum noting that plaintiff had failed to appear at an 8:00 a.m. meeting with Brank. Brank reminded plaintiff that they had agreed, during the plaintiff's performance review earlier that month, that plaintiff and Brank would meet every Monday meeting at 8:00 a.m.

In November 1987, plaintiff had discussions with Brank regarding two people: Leon Hayes and James Stores. Hayes was a black route salesman who worked the 20–22 Route. Brank wanted the route terminated. Plaintiff refused to terminate the route (and in essence terminate Hayes) and instead prepared a feasibility study showing the route as profitable, but nonetheless Brank closed the route. Later Brank berated plaintiff for failing to fire Hayes; however, plaintiff pointed out that Hayes had seniority and union rules required defendant to provide Hayes with another route. Route 20–22 was later reinstated.

James Stores was recommended by plaintiff for a route salesman position as a new hire. Brank rejected the request because he felt Stores was not "Borden material". Plaintiff argued that the company needed a black individual to work the reinstated Route

20–22, as most of the customers were black. Brank recanted his opposition to the hiring of Stores, and allowed plaintiff to hire Stores to work Route 20–22.

On November 6, 1987 plaintiff informed Brank that he would be presenting certain proposals to two potentially new customers; Brank responded that soliciting new customers required his prior approval which he was not giving. On November 11, 1987 Brank asked plaintiff to explain the sale of product below cost to a local soccer team which Brank considered to be against company policy and bad for business. Plaintiff responded by explaining that the transaction did not initially begin as a sale but rather as a donation; however, he did admit that he had undercharged the soccer team by $1.00 per case. Meanwhile, on November 10, 1987 Brank commended plaintiff on a letter he had written to one of his route salespersons. He told Gipson that "I believe you did a good job on the attached PFYA [the letter to the route salesperson]." He went on to make the following suggestions for future PFYAs [6]: 1) "The points you make should be specific, measurable, actionable and compatible with Region programs; and 2) It is sometimes good to establish a follow-up date to get a working deadline." On November 13, 1987 Brank criticized plaintiff for dumping out-of-code product with charities which was against company policy. Plaintiff testified that this had been standard practice. That same day Brank also sent Gipson a memorandum concerning truck maintenance folders. Brank pointed out deficiencies discovered by a Mr. Dudley. Brank asked plaintiff to "[p]lease review truck folders and bring up to date." In response to this memorandum, plaintiff simply sent copies of Brank's memorandum of November 13th to his DSMs. On November 19, 1987 Brank sent plaintiff a memorandum stating "Please prepare a progress report on the objectives we set on October 7, 1987." On November 25, Plaintiff responded by noting that 1) he had attended all scheduled meetings on time except for one on October 26, 1987—he had forgotten the meeting because (although he was at the office) other events had diverted his atten-

tion; 2) he was not calling on major accounts every two weeks because he couldn't get appointments that often; however, he was telephoning these accounts between appointments "when necessary"; 3) he was "averaging" four days/week in the field, except for the week following his prior week's vacation; also he had spent only one day on Routes 2005, 2044, and 2053 since October 7th; and 4) he had completed all assigned tasks, held preplanning sessions before each promotion period, and scheduled weekly meetings with his DSMs. Finally, he noted that he would be unable to attend a class on communication skills for managers until January 1988.

On December 10, 1987 Brank reprimanded plaintiff for three (3) specific problems: 1) failure to implement displayable accounts program on Krunchers; 2) failure to secure route riding program; and 3) failure to have retail stores appropriately displayed. Brank reminded plaintiff that the reprimand became a part of the plaintiff's permanent file. He ended the reprimand by stating "George I urge you to take the action necessary to bringing these areas up to our standards." This reprimand, as well as most correspondence from Brank to plaintiff, was copied to Pat Miller. On December 11 and 21, 1987 Brank sent plaintiff memoranda highlighting DSM route riding deficiencies for Lionel Harris, Mike Zavorka, Rich Daniels, and Don Carmack. On December 14, 1987 Brank issued plaintiff a reprimand for insubordination. He pointed out that despite telling plaintiff earlier that the selling of Kruncher displays was the number #1 priority for plaintiff's DSMs from December 10 until December 18, Brank had found that no one, including the plaintiff, was working on the displays. He further noted that plaintiff had indicated that he would not have his DSMs work on Saturday (December 12, 1987) to sell the Kruncher displays. On December 15, 1987 Brank issued plaintiff another reprimand regarding plaintiff's account call on National stores. He pointed out to plaintiff that he had 1) missed an advertising campaign; 2) failed to comply with the buyer's request for unit sales volume on each promotion; 3) argued with the buyer as to

6. Points For Your Attention.

whether or not the buyer had made such a request; 4) failed to provide relevant information to the buyer and again argued with the buyer as to service levels versus percent increase in sales; 5) made the presentation in a "casual, lackadaisical manner"; and 6) missed an ad for Krunchers because he had made the appointment too late. On December 18, 1987 Brank informed plaintiff that his performance reviews and salary recommendations for Don Carmack and Rich Daniels had not been approved by Pat Miller. Miller disapproved of the salary increases because 1) Carmack's sales were below both plan and the region average, he had failed to train more than two (2) people in accordance with company standards, and he had failed to be on plan with his merchandising; and 2) Daniels' sales were also below plan, although his stales were controlled well. Miller explained that in order for an employee to receive higher than a middle grade (C) rating, the employee had to exceed their plan whether it be in sales or stales. On December 22, 1987 Brank sent plaintiff a memorandum informing him that effective immediately plaintiff was responsible for the Shop N' Save account. Brank further informed Gipson that the Deli Chip account had been lost ninety (90) days earlier, a business worth 31,200 cases of product. Brank wanted to know what happened, why plaintiff had not made an appointment with the Deli buyer as Brank had requested, and why Brank was never informed (before now) that the account had been lost.

In January 1988, plaintiff presented the business review for National stores. Present for the review were National personnel and Brank. On January 27, 1988, following the presentation, Brank sent a memorandum to plaintiff congratulating on making an "excellent presentation".

On February 28, 1988 Charles Kester received from plaintiff a seventeen (17) page "letter" expressing plaintiff's dissatisfaction with his September 1987 job performance evaluation and the various reprimands issued to him by Brank. The document goes to great lengths to explain why plaintiff felt the reprimands were unjustified and to voice his personal dislike for Brank. Although the document consistently accuses Brank of harassing the plaintiff and gives "examples" of the alleged harassment, no where does it state that plaintiff believes he is being victimized by Brank on the basis of race. Kester found plaintiff's accusations to be quite serious and discussed the matter with Pat Miller and Essex Mitchell, defendant's Equal Employment Opportunity Officer. They decided that given plaintiff's accusations, and subtle indications that race discrimination might be taking place, it would be best for Miller and Kester to personally investigate the situation.

Meanwhile, on March 10, 1988 Brank sent plaintiff a memorandum expressing his satisfaction with a recent market check conducted with the plaintiff. He told plaintiff that he "enjoyed our time together on March 8, 1988." He went on to remind plaintiff of important points they had discussed: #1 priority for plaintiff to increase his DSMs' route riding; that all region personnel understand the way plaintiff wants the shelf merchandised; and that it was imperative that region personnel sell corn displays. He ended the memorandum by stating "I believe you have made progress on how the stores look. Keep it up." Following receipt of this memorandum, plaintiff (on March 19, 1988) issued a memorandum to his DSMs highlighting the areas Brank had emphasized in the March 10th memorandum. As to route riding, the only statement addressing this concern was "The most efficient way to correct the above problems is to ride routes. Make sure you spend as much time as possible riding routes. I will spend more time on routes."

On March 23, 1988 (without advance warning) Kester and Miller visited St. Louis to meet with Brank and Gipson. They met with Brank alone first to apprise him of the letter that Gipson had sent (Brank did not know until then of the letter's existence). They first discussed the September 1987 job performance evaluation.[7] It was discovered that

---

7. What was discussed at this meeting with Brank was testified to by Charles Kester. It was offered without any objection by plaintiff.

the sales and expense planning numbers were incorrect because Brank had used figures for the entire month of August because of Borden's buy-out, whereas normally only a four (4) week period in August would have been utilized. It was Miller's opinion that plaintiff's complaints about his ratings for development of sales people and advertisement/promotion were subjective. However, with regard to plaintiff's rating for advertisement/promotion, the Neilson figures[8] supported Brank's rating. As to the training program, it was everyone's opinion that plaintiff's rating was justified because he did not achieve plan requirement of training one person per district per quarter. As to customer rapport, Miller had personal knowledge that Schnuck's buyer, Cindy Parentin, had criticized plaintiff's work. Finally, it was agreed that plaintiff had failed to complete the strike plan as requested since two routes were not serviced during a strike that previous summer/fall.

The group then discussed plaintiff's accusations of verbal abuse and harassment. Brank claimed that he had discussed the National account call reprimand (December 15, 1987) and still believed that plaintiff had missed an opportunity for a Kruncher advertisement.[9] As for the Shop N' Save reprimand (December 22, 1987), Brank claimed he had never refused to discuss the matter with plaintiff and had never been made aware of the situation as outlined in the plaintiff's letter. Brank told Kester and Miller that plaintiff had been warned before about making proposals for new business without first bringing it to Brank's attention, and that is why he reprimanded him. Brank admitted that he issued the reprimand about selling product out-of-code based upon information given to him from E.T. Nolan and that he had not personally reviewed the information received. Regarding the reprimand for insubordination (December 14, 1987), Brank stated that he had emphasized the importance of the Kruncher's display to plaintiff and when he asked plaintiff to instruct his DSMs to work on Saturday, plaintiff had refused to do so. As to the verbal abuse, Brank admitted that at least on one occasion he did threaten to "tear plaintiff's head off". Miller told Brank that this kind of remark was inappropriate and would not be tolerated under any circumstances. Finally, as to the loss of the Queen store accounts, Brank claimed that he did not know about the situation until Tony Kern told him.

Following their discussion with Brank, the three men met with the plaintiff. Plaintiff initially began the discussion by pointing out that only he and Lionel Harris had failed to receive pay increases, the only two black members of management. However, this was not in fact the case, as pointed out to plaintiff. Harris did receive a significant pay increase retroactive to January 1, 1988 which the plaintiff himself had approved over a month earlier. Kester testified that Harris' initial pay increase had been inadvertantly missed because wages had been frozen for a time and when the freeze was lifted, Harris' pay increase had been overlooked. Since Borden policy prohibited retroactive increases, management increased Harris' wage increase to make up the difference for the lost time.

The men then discussed the plaintiff's job performance review of Fall 1987.[10] It was agreed that in some areas Brank's figures were wrong; and in other areas plaintiff's figures were wrong. It was also noted that some of the review was based upon observations which were strictly subjective for which there really was no way to measure accuracy. It was pointed out to the plaintiff that although Brank had plaintiff $125,000 behind plan; plaintiff had actually been $165,000 behind plan. Plaintiff attempted to explain this deficit by blaming it on the loss of the Kroger account; however, Miller pointed out that such a loss is part of doing business.

---

8. A rating service summarizing data from supermarket scanning tapes.

9. Plaintiff claimed in his letter that Brank had refused to discuss the reprimand with him.

10. The Court's findings of fact regarding this March 23, 1988 meeting is based upon a review of the plaintiff's testimony, Kester's testimony, defendant's Exhibit FFFF—Kester's personal notes of the meeting; and defendant's Exhibit IIII—Kester's formal memorandum to files located at the Indianapolis headquarters location.

Miller and Kester told the plaintiff that although the expense figures were incorrectly computed (a five week August instead of a four week August), a revised computation still showed that he had overspent according to plan. As to the training of salespersons and route riding by the DSMs, Miller and Kester took into account plaintiff's explanations regarding vacations, the strike, and the fact he had trained more than Kern had trained (in Region 3). Plaintiff agreed that he may have a problem as to rapport with major customers, but he felt that he should have been made aware of this problem before the appraisal. As their discussions continued, Kester noted that Brank and plaintiff had very different perspectives as to how account calls went. As to plaintiff's failure to aggressively promote the defendant's corn products, plaintiff explained that if he had $2000 to spend, he spent it on (potato) chips because that had always been (in the past) KAS philosophy.

After reviewing the job performance appraisal and apprising the plaintiff what changes would be contemplated, Miller directed his attention to the relationship between plaintiff and Brank. According to Kester's testimony, notes of the meeting, and formal memorandum to defendant's files, Miller believed that the situation did not involve racial discrimination but rather a serious communications problem. Miller chastised both plaintiff and Brank for failing to talk directly to each other and work out their differences. He told both of them that they were talented managers who have the ability to move the business forward and this situation was not accomplishing that mission. He emphasized that Brank was the Division Sales Manager in charge of running the business and as senior manager in the division it was his duty to make or review all major decisions affecting the business. Miller felt that personnel issues were a matter for the Human Resource Department. He reiterated that it was company policy for all employees to be treated fairly and equally. In order to change the combative relationship that appeared to be in place, it was agreed that certain specific communications parameters would be set. These included: 1) Brank and plaintiff having weekly meetings in order to discuss face-to-face any issues arising; 2) any performance evaluations of Gipson would be first discussed in person and follow-up letters would also be presented personally and discussed; 3) both men would spend more time together outside of the Monday morning meetings in an informal atmosphere discussing business issues; and 4) Brank and Gibson were to inform other employees that they were working together to communicate more effectively with each other and to get the business moving again. Miller also informed Gipson that defendant would redo his Fall 1987 job performance evaluation and adjust the overall reevaluation based on corrected information, that he would be given any salary increase due retroactive to January 1, 1988 (properly adjusted to make the plaintiff whole for the period back to September 1, 1987), and that he would get his ninety (90) day review as promised back in September 1987 (when plaintiff had been put on the six-month performance plan) and that any salary increase coming out of that would also be effective January 1, 1988. Kester noted that everyone shook hands and that the meeting ended in a positive manner.

Back in Indianapolis, Kester reviewed the meeting and "communications agreement" with Essex Mitchell. Kester testified that Mitchell felt that the action taken was appropriate.

Shortly thereafter, Brank issued a revised performance evaluation based upon the meeting of March 23rd. The revised evaluation upgraded Accountability # 2 from a C − to a C, upgraded Accountability # 4 from an F to a C −, and the overall grade was changed from an F to a C − with an accompanying 3% wage increase recommendation. Since the raise was retroactive to 1987, in reality it was a 6% raise. Gibson attempted to once again present to Brank his objections to his original 1987 job review, but Brank refused to discuss the matter any further and told plaintiff that all he was getting was the wage increase recommended pursuant to the revised job evaluation.

On April 4, 1988 Brank sent to all RSMs and DSMs a memorandum in which he pointed out that "George had an excellent call at

National" and that Gipson's follow-up letter was a good example to be followed. Shortly thereafter, Brank issued Gipson his job performance evaluation for the period January 1, 1988 to March 19, 1988. He was rated as follows: Accountability # 1—Superior (S); Accountability # 2—C; Accountability # 3—F+ (noting that although there had been improvement, route rides were still below company standard and region standard); Accountability # 4—C— (noting that the training program had been implemented and was on target; however plaintiff still needed to do more "work withs", i.e. personally working and riding with his DSMs); Accountability # 5—C— (noting that there had been improvement in this area, but that plaintiff still needed to more actively participate in food clubs and to more actively entertain key executives in major accounts); Accountability # 6—C+ (noting that this was an area of major strength for Gipson); and Accountability # 7—C— (noting that plaintiff was still not concentrating on getting corn displays, that although there were improvements in store appearances, there were still wide disparities among the stores, and that Gipson needed to spend more time in the field training and motivating his DSMs to get the stores fixed). Plaintiff's overall performance grade was a C. Brank noted that plaintiff had improved his job performance since the last evaluation; however, he noted that plaintiff still had to spend more time directly working with his DSMs—that plaintiff "spends too much time fixing problems rather than training and directing his DSMs to handle them." Brank noted that there had been improvement in communications; "however, he still needs to work on surfacing and talking about operating issues and problems." On April 25, 1988 Brank issued a memorandum to all RSMs and DSMs highlighting a Schnuck's business review conduct by Gipson. Brank stated that "[i]t was an excellent review!". May 6, 1988 Gipson reported sales above plan for the week ending April 29, 1988. Brank sent the report to his "new" supervisor, Bruce Cutting [11], noting that plaintiff had done a "great job".

On May 10, 1988 Cutting visited St. Louis to meet personnel, including Brank and Gipson. Cutting knew Brank from a previous position at Proctor and Gamble. He first met with Brank (alone) to discuss business in general, then to discuss Brank's relationship with the plaintiff. Cutting then met with the plaintiff. Plaintiff complained to Cutting about communication problems with Brank and that he felt that Brank was treating him unfairly. He never said anything to Cutting about Brank using any type of racial slurs in connection with him or any other employee. Cutting was very direct with the plaintiff, he emphasized that the company was interested in job performance and not "personal" difficulties between employees. He told Gibson that he had to have better direct supervision of his DSMs, and his DSMs had to have better direct supervision of their route salespeople. Cutting told the plaintiff that direct supervision was accomplished through route riding; not "open route riding" or "pulling a route".[12] He told plaintiff that a lack of route riding often resulted in sloppy handling of the marketing of the defendant's merchandise. He also told the plaintiff that reporting riding open routes as route riding was improper. He and Gipson then went on a tour of several of the store accounts that the plaintiff manages.

Cutting followed-up his visit with a memorandum to Gipson, dated May 13, 1988. In this memorandum, he states that he "totally enjoyed my visit with you, George." He goes on to tell the plaintiff that he appreciates the many years of experience that the plaintiff has in route sales; but, he emphasizes that "I would, however, make one important distinction with you that I believe you understand. The Region Manager's job draws on the experience of the route so that you can direct the route to build his business, not just ride the route." He further states that "[w]hen Rick or I focus strictly on *performance* ex-

---

11. Bruce Cutting joined the defendant in May 1988 as Vice–President of Sales, replacing Pat Miller who had been promoted to Vice–President of the Division.

12. Riding an "open route" or "pulling a route" is when a supervisor (a Regional Sales Manager or District Sales Manager) handles a route alone or a route not routinely assigned to a route sales person.

pected from you or your districts or your routes, the effort is being placed so that you can *improve* the total operation.... when you work with your DSMs, your focus must be in that also, George ... Spending effective training and development time with your people can *add* to the strong image I have today of George Gipson. Concentrating on performance issues (as opposed to attitudes) with specific methods of improving expectation levels will make George Gipson a strong Region Manager not just a strong salesman." Cutting reminds Gipson that being a RSM is different from being a DSM or a route salesperson and that "[d]riving the need for developing your organization is tough on you, only because you pointed out that your previous conditioning from a management/supervisory image was *not* to work with routes or districts, simply because that wasn't the way it was done." He goes over the store accounts visits and reiterates that he expected a 10 rating for plaintiff's better stores, yet of the plaintiff's better stores, the highest score was a 7 out of 10, with the balance being a five. "That is not to be interpreted as a warning, but rather opportunity for you to build the organization to a ten ... George, the stores need performance improvements and you can see where ... A part of that situation can immediately improve if you manage the planning of time DSMs spend on routes ... My personal belief is that your business will improve if your managers are training and managing their routes in person, on site ..." Cutting specifically points out to the plaintiff that his DSMs are not riding routes; i.e. that they have collectively averaged **.8 days per week.** He contrasts this with Region 3, wherein the DSMs collectively have logged an average of **2.1 days per week.** Finally, Cutting finishes his memorandum by briefly addressing plaintiff's relationship with Brank. He tells the plaintiff that "I enjoyed the person of George Gipson. It is clear to me that Rick Brank does also. The fact that both of us want to help you improve your performance as a Region is testimony to our mutual need as managers to provide you training, direction, and focus on how you do that. Being constantly defensive is a conditioning I do not condone nor understand. Defensive reaction to constructive comment

simply gets in the way of progress, George. Listen to me, for I care for you. It's my job and Rick's job to build your performance, not reasons why things don't happen."

On June 22, 1988 Cutting wrote Gipson thanking him for his "time, effort, and frankly outstanding results in preparing for the Krunchers! market tour in St. Louis/East St. Louis for Monday, June 20!" Cutting noted that although plaintiff and his people had to devote most of the weekend preparing the market tour, it was worth it because new business was obtained.

On July 5, 1988 Brank wrote the plaintiff a written reminder that certain activities had priority and required Gipson's immediate attention. On July 28, 1988 Brank commended plaintiff on a follow-up note that the plaintiff had sent with regard to the Shop N' Save account. Brank sent a copy of this commendation to Cutting.

In the beginning of August 1988, Cutting was concerned about inconsistencies in the quality of Gipson's store accounts. He suggested to Brank that Brank develop a specialized program for the plaintiff so that the plaintiff would clearly understand his responsibilities and duties. Cutting had used these "performance development programs" in the past with other lower level management employees while at Proctor and Gamble. Cutting believed that at least fifty percent (50%) of the time, these performance development programs were one hundred percent (100%) effective; however, the other 50% of the time, there was some degree of failure. Cutting knew that in 1987 Brank had unsuccessfully attempted to put Gipson on a more generalized performance development program.

At Cutting's suggestion, Brank did develop a performance development program with the plaintiff. Brank and Gipson discussed the program and its importance to enhancing plaintiff's managerial skills. Plaintiff understood the purpose of the program; however, he testified that he did not believe his participation in and/or completion of the program was "mandatory".

The document outlining the program states that the purpose of the program is "to

initiate a personal development program that will develop and refine skills levels in the following areas: (1) District Sales, Manager training, and development programs; (2) Key Account Management program; (3) Personal selling skills levels; (4) Region route analysis skills." The document further states that the objective of the program is "to enhance performance in those areas of current job performance that are *the* most critical to furthur (sic) development in the current position, and which will allow future consideration for positions of responsibility greater than that which George Gipson now occupies." The document then sets forth, in detail, four program objectives and how the plaintiff is to meet them. It also notes the correlation between the four objectives and the plaintiff's job description. The program includes a "development review meeting" on October 3, 1988. Finally, the document ends on a personal note from Brank. He states that he looks forward to "fully participating with you in these development program objectives. And I believe that by your placing your full energies into this program there will be an immediate pay back to both yourself and the company. On a longer term basis I believe you will stage yourself for upward career progress. Please allow me to assist you in this at any time you feel you need my help or support."

On August 10, 1988 Cutting sent a memorandum to Brank regarding an inquiry that Cutting's supervisor, Pat Miller, had directed to Cutting (a copy of Miller's memorandum is attached to Cutting's memorandum). Miller was concerned about an activity report from Al Elliot (a copy of the activity report is attached to the memorandum) regarding the warehouse operation in St. Louis. Part of the plaintiff's responsibilities was the daily management of the St. Louis warehouse. In his memorandum to Cutting, Miller states:

"1. Why do we have routes ordering product and then returning it. If the product ordered cannot be used, sales management then looks around for a home for it. What is the plant supposed to do with it if returned.

2. What promotion fell through?

3. The plants are instructed *not* to ship short coded product to the field for obvious reasons. George, again, has over reacted.

Please get into the ordering and communication problems."

In his memorandum to Brank, Cutting tells Brank to review Miller's memorandum and send him an answer to it. He advises Brank to include a copy of the August 1988 performance development program for Gipson in the answer because "it addresses I believe the core of the problem.".

On August 22, 1988 Brank sent a memorandum to all of the RSMs telling them to review the "excellent follow-up" memorandum Gipson had sent one of his DSMs, Don Carmack. In this memorandum to Carmack, plaintiff tells Carmack that after route riding with route salesperson Don Relling, several things need immediate attention. Plaintiff states that these things need immediate attention "in order to get maximum sales out of each account and be more efficient.". A copy of Gipson's memorandum to Carmack and a copy of Brank's memorandum to the RSMs was sent to Cutting.

On or about October 5, 1988 Brank reviewed the plaintiff's performance as to the August 1st Performance Development Program. As to Objective 1, Brank wrote that no checklists were submitted by Gipson, and only 2 PFYAs, one for DSM Zavorka and one for DSM Patterson. He figured that this translated into a 17% accomplishment of Objective 1. As to Objective 2, Brank wrote that only one follow-up letter had been written by the plaintiff instead of the required 12 letters. With respect to Objective 3, out of a required utilization of the 3-Part Selling System (agenda, written presentation, and follow-up letters) as evidenced by 12 reports, Brank reported that plaintiff had only submitted one (1) follow-up letter. He figured that this translated in to an 8% accomplishment of Objective 3. Finally, as to Objective 4, out of 3 required business reviews, Brank reported that Gipson had only done one (1). This translated to a 33% accomplishment of Objective 4. When Brank totalled all of the plaintiff's scores, he determined that Gipson had only accomplished 14% of the goals of

the Performance Development Program. Brank sent Gipson a memorandum noting that a 14% accomplishment of the program's goals was not acceptable. Brank evidently decided to extend the program for another two (2) months and he explicitly reiterated the four objectives and plaintiff's requirements to meet these objectives. He ended the memorandum by stating "George, please let us work together and get your program rolling."

Brank then met with Gipson to review his written memorandum concerning the plaintiff's poor accomplishment of his performance development program's goals. Gipson told Brank that he had considered his participation in the program "optional". Brank was angered by Gipson's failure to seriously address the objectives of the performance development program. He tore up his review and threw it and all attached documents in the trash (where plaintiff later retrieved them). Plaintiff testified that Brank told him that another performance development program would be initiated for Gipson and that there would be absolutely no question that it was mandatory.

On October 17, 1988 Brank wrote Gipson twice regarding the failure of two of his DSMs to perform route rides and training days as required. In the first note, Brank states "George, please discontinue the practice of having 2 DSM's work open routes. This past week both Rick [Daniels] and Lionel [Harris] worked an open route. Neither man rode any routes." In the second note, Brank itemizes the route riding days and training days (since January 1988) for each of Gipson's DSMs. Rick Daniels and Lionel Harris had the fewest route riding days and Harris had no training days. He notes that all of the DSMs' performance "does not meet company standards, i.e. 2 × per week." He asks Gipson to write to his DSMs and bring this matter to their attention. He further tells Gipson that he wants to see a copy of the memorandum that Gipson sends out to his DSMs. A copy of Brank's letter went to Cutting. Gipson responded on October 24, 1988 by sending a memorandum to his DSMs and attaching a copy of Brank's memorandum of October 17th. In his memorandum,

Gipson encourages his DSMs to increase the number of route riding and training days per week. He notes that this directive originated with Brank by stating "Please find attached a memo from Mr. Brank concerning route rides and training days. As you can see by his records, we are not up to standards."

On or about October 27, 1988 Gipson, Miller, Cutting and Brank did a market check in Lionel Harris' area. They found the area to be poorly serviced and merchandised. Gipson directed a memorandum to Harris pointing out the deficiencies found and placing Harris on 90–days probation. At trial, Gipson did not refute the information contained in this memorandum, but testified that Brank wrote it and told Gipson to sign it and give it to Harris.

On or about October 27, 1988 Cutting accompanied Gipson to Dierberg's. Plaintiff failed to use the 3–Part Selling System in his presentation to the Dierberg's buyer. He also told Cutting that the Dierberg's buyer had been earlier informed about a new product, Kruncher Alfredo, when in fact this was not the case.

On November 1, 1988 Brank directed a memorandum to plaintiff wherein he pointed out certain deficiencies in Gipson's job performance and placed him on a 90–Day Probation Program. Gipson was directed to meet company performance standard levels in the training of DSMs, and with respect to personal account call frequency. He was directed to be more straightforward with his supervisors. He was directed to learn the inventory and ordering system, and to train and manage the warehousemen. Finally, plaintiff was directed to complete the required Key Account Business Reviews with Dierberg's and Shop N' Save. In closing, Brank tells Gipson "I believe it is important to evaluate the past only as it can help you to improve your performance in the future. I sincerely hope you bring up your deficient areas. If there is anything I can do to help you I am ready and willing to do anything I can to help you."

On November 1, 1988 Brank did a "work with" with Mike Zavorka (a white male DSM). He found Zavorka's stores to be

poorly serviced and managed. He placed Zavorka on a 90–Day Probation program and advised him that failure to "make dramatic improvements" could result in termination. A copy of this memorandum went to Cutting, Kester, and Gipson.

On November 5, 1988 Gipson directed two memorandas to his DSMs. In the memorandum regarding "Sales Audit", Gipson simply refers his people to a memorandum issued on November 3rd by Brank requesting that a sales audit be conducted and directing Gipson and Kern to carry it out. In his second memorandum regarding "Status Report", Gipson tells his DSMs "[a]s you can see from Mr. Brank's memo (attached), he wants one more report. I will not require you to write another report but you must do this: complete all parts of the reports you are sending me now. If there is something else you want me to know please use the back of your weekly report." Brank's memorandum to all of his RSMs, dated October 31, 1988, did not request any additional reports be written, but rather stated "I would like for you to put into your weekly status reports more information. I am interested in hearing about your accomplishments, and also the accomplishments of your people." He then set out a format that he wants the RSMs to use "when writing your narrative report." Finally, he suggests to the RSMs that "you require a letter from your DSMs with similar information."

On November 7, 1988 Gipson wrote Brank requesting assistance in developing a plan to get the small bag trade margins in line with "A/O (?) small bags." He states that he "has no idea how to change the trade margins." Brank replied with a detailed recommendation as to how to do an analysis of small bags and a marketing strategy. The reply is straightforward without any derogatory remarks or threats.

On November 10, 1988 Brank sent Gipson three (3) memoranda detailing problems with the warehouse inventory levels. In a memorandum concerning Schnuck's inventory levels, Brank sets forth the Schnuck items that are either out of stock or are low in stock. He reminds plaintiff that "[d]uring numerous conversations with Bruce Cutting, Ivan Waun and myself you were asked, appealed to, and finally instructed through your 90 day probation write up to review inventories and orders daily. I am disappointed that you are not doing as requested, appealed to, and instructed." He further reminds plaintiff that inventory standard is 10,400 cases, excluding promotions, Schnuck, and National. Finally, he tells Gipson that warehouse management is Gipson's responsibility, that it is covered in Gipson's 90–Day Probation program, and that "[y]our continued failure to get involved in and maintain adequate warehouse could lead to your termination." In the second memoranda concerning "warehouse out of stocks", Brank tells Gipson that Brank was approached by Frank Derner and Dick Tanner "who were highly upset with the warehouse out of stocks." He informs Gipson that they reported 25 out of stocks, a situation that Brank finds intolerable. He reminds plaintiff that plaintiff is to meet with Greg Vaughn (warehouse lead foreman) daily and go over Vaughn's ordering on a line by line basis and review all orders for accuracy. Brank informs plaintiff that since plaintiff was unaware of these shortages, via a conversation on November 4th, then plaintiff is not carrying out the direction given to him regarding daily review of Vaughn's ordering. Brank reminds plaintiff that "[y]our continued refusal to follow these instructions could lead to your dismissal." In the third memorandum regarding warehouse management, Brank informs Gipson that Ivan Waun had called him to tell him that Greg Vaughn had not turned in any orders on Thursday or Friday of the previous week; and that this omission was a violation of the company's 8–day lead time policy, as well as explicit instructions to work daily with Vaughn. Brank tells plaintiff that his performance as it relates to warehouse ordering, inventory and management is deficient and "[i]f you continue to perform this way it will lead to your termination." Brank closes by telling Gipson that "[i]f there is any part of warehouse ordering, and/or inventorying, and/or management that you need help with I will be glad to provide any further direction and/or training you deem necessary." Copies of these memoranda were forwarded to Cutting.

On November 16, 1988 Brank issued a written memorandum, with a copy sent to Cutting, in which he recalled the prior day's meeting with Gipson regarding warehouse inventories. He states that he told Gipson to spend at least two (2) hours every day with Greg Vaughn to make sure that Vaughn was using the warehouse inventory system correctly. He further states that Gipson informed him that he had Vaughn change from using the average 16 week movement to using a build up number. Brank states that he told Gipson that he was not authorized to make such a change, and that Vaughn was to use the system as instructed by Cutting, Waun, and Brank. Brank states that he told Gipson that Vaughn and the warehouse was his responsibility, and that Gipson was "not getting the job done." Finally, he states that Paul Oliver had called Brank complaining about out-of-stocks at two Schnuck stores, and that he had to tell Gipson to go see Oliver and correct the situation.

On November 16, 1988 Cutting, Miller, Brank and Gipson went on a market survey in which several problems with the plaintiff's region were observed. On November 23, 1988 Brank sent Gipson a memorandum admonishing him for failing to secure an important feature ad at both Dierbergs and Shop N' Save in time for Thanksgiving, and for failing to meet his requirements for account call frequency.

On December 1, 1988 Brank wrote Gipson admonishing him for the condition of stores serviced by a Mr. Cretin, a route salesperson under the direct supervision of DSM Don Carmack. Brank tells Gipson that he has failed to adequately document poor performance of Carmack. He states that "[y]our performance is deficient as it relates to *specifically* the failure to work with and evaluate Don Carmack's performance. A more general statement would be, you are not working with and training your people." He further tells plaintiff that "[i]f you do not understand my direction or you need help— please let me know and we will correct this. However, *you* are not getting your job done in this area and I implore you to begin performing to standard in this critical area of your job description." A copy of this memorandum was forwarded to Cutting. He in turn forwarded it to Pat Miller and Charles Kester with remarks handwritten at the bottom. His remarks read as follows:

"1) George Gipson is on a 90 day performance track to help him improve his management skills and results.

2) I do not want to be caught in a Catch 22 on this sensitive issue—with so many "threatening" notes or with antagonistic letters. This note seems to me to be corrective approach and content. Comments?"

On December 2, 1988 Brank sent a weekly status report to Bruce Cutting. The report was generally a positive one. It states that the company has been recently named National's Private Label suppliers. It also unfortunately conveys the loss of a potentially big customer due to miscommunications with the headquarters office. Finally, other than general business news, Brank commends Greg Vaughn for handling of warehouse operations. He states that "[o]ur changes in the St. Louis systems of ordering and inventory control are just now bearing fruit. Greg is up to speed and our warehouse is beginning to sparkle. Also, I detect an 'esprit de corps' feeling building in the organization and finally with our warehouse staff. Greg has brought the inventory levels to target and has substantially reduced those 'out of stocks' within his control."

On December 16, 1988 Brank wrote a memorandum regarding a meeting he had earlier that day with plaintiff. In this memorandum he states that he told the plaintiff that he had to meet the numbers set out in the 90–Day Probation program or he would not be the St. Louis RSM after the first of the year. He states that Gipson responded that Brank was out to get him no matter how good his numbers were; Brank replied that wasn't the case. He further states that Gipson then requested "an offer to leave", to which Brank had no real answer.

On January 3, 1989 Brank sent Gipson two memoranda. The first one was a summary of the meeting they had on October 3, 1988 regarding plaintiff's failure to carry out the August 1988 personal development program. In this memorandum, Brank states that dur-

ing the review process, Gipson got "highly upset" and accused him of being "criminally unfair" and that Brank's motive was solely to deny Gipson a salary increase. Brank states that he told Gipson this was not true, and that as a sign of good faith, he would tear up his review if Gipson agreed to do the things set forth in the August 1988 personal development program. He closes by pointing out that since Gipson agreed to carry out the program's directives, he tore up (as did his secretary) copies of the negative review. In the second memorandum, Brank summarizes the meeting that he, Gipson, Pat Miller, and Bruce Cutting had on November 16, 1988 following a market review. Brank reminds Gipson that it was necessary to remind plaintiff of his obligations pursuant to the August 1988 personal development program, and that if the plaintiff had addressed the program properly, the market review would have been a better one. He reminds plaintiff that plaintiff explicitly agreed to carry out the objectives of the August 1988 personal development program.

In addition to the written memoranda, plaintiff met with Cutting and Brank. Plaintiff was given a progress review memorandum regarding his performance numbers during his probation period. Plaintiff disagreed with a majority of the review and claimed to have his own documents showing substantial compliance with the requirements of his 90–Day Probation program. Cutting reiterated the need of plaintiff to address the objectives of his probation program. He told Gipson that if Gipson had documents to support his contention that he had met the requirements of his probation program, that Cutting wanted to see these papers.

On January 4, 1989 Brank sent Gipson a memorandum reiterating Cutting's request to see what documentation plaintiff had to support his belief that his performance numbers were better than those shown on the probation review report. Brank tells Gipson to "[p]lease collect the data and let's bring the report up to date." This same date, Cutting sent a memorandum to Gipson summarizing the meeting the day before and expressing Cutting's concern about plaintiff's understanding as to his responsibilities as a Regional Manager as differing from those of a District Manager. The memorandum generally warns Gipson that although Cutting and Brank want the plaintiff to succeed, he is not doing the work adequately. He tells Gipson that there is nothing wrong with the plaintiff's work ethic but that plaintiff was not operating in the manner the company required for its Regional Managers. Cutting points out that the probation program was the direct result of plaintiff's failure to address the prior performance programs, a poor market tour, the failure to plan a sales call, a serious misleading statement during a sales call, and excessive inventory in the St. Louis warehouse. He reminds Gipson that "[o]ur discussion on January 3 emphasized that you need to attain the performance requirements—and these are Region Manager activities, not District level activities, George. Your previously established capability to handle a District assignment was proven over twelve years in St. Louis. Those job requirements for handling the DSM position are not the same as are required in the Region Manager position." He goes on to point out to plaintiff that he is now a Region Manager and a manager of managers, not just a manager of routes. He tells plaintiff that "[n]o one doubts your effort level" however, the plaintiff's efforts must be measured against those activities which accomplish important region level objectives. Again he reiterates that the methods of reaching those objectives are specifically outlined and Gipson has no choice but to follow these methods if he is to remain a Regional Manager. Again he emphasizes that "[y]ou are not a District Manager or even a 'Super' District Manager", George. Finally, Cutting tells plaintiff that if he does not reach the requirements of his probation program, "then you are choosing your *own* future—you are telling us that you simply cannot perform the duties required of a Snacktime Region Manager. That decision of yours is due by February 6, 1989." He closes by telling the plaintiff that both he and Brank believe that he can meet the requirements and that they want him to meet the requirements.

On January 6, 1989 Pat Miller sent a memorandum to Gaylen Legan, defendant's president, updating him on the situation with

plaintiff. He reports that Gipson is coming to the end of his second performance track or probationary period and that Brank and Cutting had met with plaintiff to review his progress thus far. He further reports that "[d]uring the review George alluded several times to the fact that he felt he was being discriminated against by Rick because of his race. He had made similar statements to Charlie Kester and I a year ago when he and I met with George for a similar meeting. In both instances he either could not or would not provide us with any examples." Miller expressed his belief that Brank was not racially discriminating against Gipson. Miller further reports that Kester is going to meet with plaintiff the following week and "sit down with George away from the office to give him an opportunity, once again, to express and identify the instances of discrimination." Miller finally notes that Kester will offer, again, to have a human resources manager involved instead of one from Snacktime if the plaintiff so desires; and that the meeting with Kester is with the knowledge and advice of Essex Mitchell (the defendant's EEO representative).

On January 10, 1989 Kester met with the plaintiff alone in St. Louis. They first talked at a nearby restaurant, and then finished their conversation back at the office. Kester sought from plaintiff specific instances of racial discrimination; instead plaintiff generally expressed his feelings that Brank was out to get him. He told Kester that Brank had given him his most recent job performance appraisal one page at a time over several days; that Brank had several months ago walked out of a lunch meeting with plaintiff and plaintiff's DSMs; and that Brank was wrong regarding a reprimand for the "Non-Stop Program". Kester told plaintiff that these complaints were performance issues for plaintiff, Brank, and Miller to work out; that Kester just wanted to know if Gipson had any specific instances of race discrimination. Gipson said he had none. Kester asked plaintiff about the use (by Brank or any other employee) of any direct statements regarding race or any racial slurs concerning plaintiff; Gipson again answered in the negative. Kester offered to have Essex Mitchell speak with plaintiff; Gipson refused the offer. They also discussed Region 3 and Tony Kern. Plaintiff told Kester that Kern also had problems with Brank and that even if plaintiff had been the RSM of Region 3 and Tony Kern that RSM of Region 2, Kern would still have problems with Brank.

On January 10, 1989 Brank sent plaintiff a memorandum outlining plaintiff's obtainment of his performance requirements as of January 10, 1989. As of that date, plaintiff had only completed the requirement of three (3) personal account business reviews. Brank further reviews their earlier conversation wherein plaintiff was not interested in returning to his former position as a District Sales Manager in St. Louis, and that he was also not interested in a District Sales Manager position in another location which would require relocation. Finally, Brank implores plaintiff to meet his performance requirements, and that if plaintiff needs help, he should speak to Brank about it. A copy of this memorandum was sent to Miller, Cutting, and Kester.

On January 16, 1989 Brank sent plaintiff a memorandum regarding a recent account call on Shop N' Save. Brank criticizes plaintiff for failing to prepare a fact sheet, although he had been asked twice to do so. Brank further criticizes plaintiff for giving false and misleading information at the account call. Finally, Brank notes that plaintiff gave lengthy speeches about "private label" (an area Brank considers outside of plaintiff's scope) to the point where the buyer, Rich Reuss, chided plaintiff about "bullshitting" him.

On January 16, 1989 Brank sent plaintiff another memorandum regarding a recent account call on Dierberg. In it, Brank specifies several instances in which Gipson conducted the call in a manner unacceptable to Brank or not in accordance with company standards. He notes that Gipson presented the written review to Dierberg with Shop N' Save's name on it. He further notes that plaintiff's delivery was poor in that plaintiff interrupted the buyer (Mike Bossi) several times, failed to maintain eye contact with the buyer, gave vague answers to specific questions, failed to present the most current in-

formation available, used a ballpoint pen to repeatedly point at Mr. Bossi, and failed to provide a written follow-up.

On February 1, 1989 Brank updated Gipson on his performance regarding the probationary program. Brank also put Mike Zavorka, on a performance track due to poor route management. Plaintiff had refused to do so, thus Brank did it.

On February 10, 1989 Cutting sent a memorandum to plaintiff summarizing their discussion of February 7th. Cutting acknowledges receipt of certain documents from plaintiff and provides him with the final results of the plaintiff's performance during the probationary period. Cutting notes that although Gipson did not meet all of his requirements at 100% performance, his numbers do indicate a "genuine effort to focus your activities against Region Manager priorities", consequently, Cutting considers plaintiff's probation period to have been satisfactorily complied with and therefore, at an end. Cutting tells plaintiff that he hopes that plaintiff has learned from this experience, that he now sees how the performance track's basic purpose was to "help you improve your skills to be able to successfully handle your responsibilities as a Region Manager." He counsels plaintiff to accept the fact that change is inevitable and not to fight it. "With a career of 17 years in place and a range of managers and management styles to observe and follow, the simple truth is that this track caused you to recognize that KAS is again changing and improving. The required new activities and standards of management performance were set up by Rick Brank when he stepped into the office. For whatever reasons, it took a long time for you to appreciate the need to develop your skills along his new direction." He further points out to Gipson that the requirements of the 90–Day Probation program were not activities specifically geared to the plaintiff, but rather activities necessitated by the requirements of the job of Regional Sales Manager in St. Louis, and more so, were consistent with the standards of performance expected of all of the defendant's RSMs. Finally, Cutting reiterates that by satisfactorily completing his probationary period, Gipson has demonstrated that

he understands and can fulfill the requirements of his job. Cutting point blank tells plaintiff that there will be no more performance tracks, that reoccurrence of plaintiff's deficiencies in these activities will result in plaintiff's removal from the position of Regional Sales Manager. "But, you should know that future failure to perform those activities is a clear decision by you to admit that the Region Sales Manager responsibility for George Gipson is ended. *Your* decision. No track. No lengthy letters. No lengthy discussions in Rick's office among the three of us. We have spent enough time outlining the basic requirements of your job. You have demonstrated you understand and can handle these." A copy of this memorandum was sent to Brank, Kester, and Miller.

During the February 7th meeting, Cutting not only reviewed the plaintiff's completion of his probation program, but also requested Gipson to work in conjunction with Brank in providing Merchandiser coverage (i.e. direct personal contact) to Schnuck. Instead, on February 28, 1989 plaintiff delegated the matter to DSM Rich Daniels to handle by telephone. On February 28th, a market tour was conducted in St. Louis of five (5) routes and ten (10) accounts in which stale merchandise was found, some of the product had expired as early as September 28, 1988. The poor results of this market tour necessitated a written reprimand from plaintiff to DSM Lionel Harris.

On March 1, 1989 Cutting sent a memorandum to Miller regarding KAS Management Structure. He reviewed several lower-level managers, including Brank and Gipson, and made recommendations as to their future with the company. As to Brank, although Brank was to remain as a KAS Division Manager, he noted that Brank's management style needed to be addressed. He observed that "[h]e has an intensity of purpose that appears threatening, especially to the poorest performing managers. His biggest challenge is to develop a style that opens communications and softens his intense personality. He must make adjustments to his methods of achieving his goals if he is to remain in his position and if he wants to achieve the in-

creased expectation levels and performance standards for his management organization."

As to Gipson, Cutting recommended demotion to a DSM slot. Although plaintiff had adequately satisfied the requirements of his probationary period, Cutting did not see any real change in plaintiff's attitude or improvement in management skills. "After 9 months of observing and listening and directing this individual, I am frankly tired of constantly having to turn his attitude and comments around. He is constantly trying to swim upstream and *looks* for debate and disagreement. He seeks explanations and excuses rather than performance improvements. He does not want to *manage* his managers' performance." Cutting then goes over a list of Gipson's failings: 1) fails to keep matters confidential; 2) "indecisive to a fault ... actively avoid answering direct questions or confronting problems"; 3) resisting (for a second time) a change in the target inventory number; 4) refusal to accept responsibility as indicated by plaintiff's constant referrals (in discussion with Cutting on February 28, 1989) to the unfairness of his DSM Mike Zavorka being placed on a performance track because Zavorka could not make the required levels due to vacation time and other reasons; 5) refusal to personally handle Merchandiser coverage with Brank for Schnuck and instead delegating it to DSM Rich Daniels to handle by telephone; 6) getting too personally involved in personnel decisions; i.e. making numerous phone calls on Zavorka's behalf to Columbus, Ohio and writing Brank's secretary's resignation letter (Cutting also suspected that Gipson also wrote Zavorka's subsequent resignation letter); 7) failing to manage his DSMs as illustrated by the large numbers of stale merchandise found in his region; and 8) due to his preoccupation with Zavorka's situation, plaintiff failed to request a major feature sale order for National stores on corn chips jeopardising the company's sales and credibility with the second largest account in the marketplace. Cutting advises Miller that on March 2nd an unannounced market tour will be conducted in all four metro Districts in St. Louis to determine the extent of the stale merchandise and to observe other potential stock problems. Finally, Cutting advises Miller that following the March 2nd tour, plaintiff will be counseled to accept a District Manager position within the St. Louis area, probably District 240. District 240 has a work force separate from the St. Louis warehouse, therefore Gipson would have no contact with St. Louis personnel. Due to the recommended demotion, Cutting recommends that Tony Kern be reassigned as the St. Louis RSM, with Kern's replacement (in Region 3) to be named later. A copy of the memorandum was forwarded to Charles Kester. This recommendation to demote plaintiff was discussed with and approved by Kester, Miller, Essex Mitchell, and other unnamed management individuals. On March 3, 1989 (following the market tour) Gipson met with Brank and Cutting at a nearby restaurant where he was informed that he was being demoted, effective March 6, 1989, to a DSM position in St. Louis. Cutting told plaintiff that the reason for the demotion was consistently poor performance and deficient management skills, evidenced as recently by the February and March market tours. Plaintiff contested the demotion by challenging the "stale numbers" and placed blame on Brank for changing product at National without telling plaintiff. Plaintiff also believed the demotion was unfair because his "sales" numbers were much higher (and had been consistently higher) than those in Region 3. Cutting attempted to explain to plaintiff that higher sales must be considered in relation to other factors, e.g. more money is spent in St. Louis for advertising and promotion than in Region 3. Furthermore, sales numbers were not the only factor in evaluating a RSM's overall job performance. Plaintiff never said anything to Brank or Cutting at this meeting about racial discrimination or that Brank had ever directed any racial slurs at him.

Gipson was allowed to retain the use of the company car for a short time thereafter; he then was required to use his personal car and was reimbursed at the rate of 27 cents per mile. Although he became the DSM for a portion of rural Missouri and Illinois, he did not relocate.

On July 31, 1989 plaintiff filed an EEOC charge claiming that the demotion was the result of race discrimination. He states that

"[b]eginning on or about 10/1/87 I was continually harassed by my immediate supervisor in that I was reprimanded, rated unfairly, placed on probation and performance programs, subjected to different terms and conditions of employment from a White Regional Manager, and finally demoted." There is no mention of any racial slurs directed to him by Brank or by any other employee. In his affidavit accompanying the charge, plaintiff provides in detail his version of the events leading up to his demotion. Nowhere in his affidavit does he mention any incidents involving racial slurs by Brank or any epithets of a racial nature used by any of defendant's personnel to plaintiff. In the pre-determination interview conducted with plaintiff, there is no mention of any racial slur. In lieu of a "no-cause determination" by the EEOC, plaintiff requested and received a "Right–to–Sue" letter. On August 5, 1991 plaintiff filed suit in the Circuit Court of St. Louis County. On September 3, 1991 the case was removed to federal court and assigned to this Court. Plaintiff seeks reinstatement to a Regional Sales Manager position, back pay, lost benefits, out-of-pocket expenses due to demotion, and legal fees.

### CONCLUSIONS OF LAW

Plaintiff Gipson has brought suit alleging employment discrimination on the basis of race. The Court has jurisdiction pursuant to the Civil Rights Act of 1964, § 701 *et seq.*, as amended, 42 U.S.C. § 2000e *et seq.*

A plaintiff in a Title VII race discrimination case can proceed in one of two ways. *Stacks v. Southwestern Bell Yellow Pages,* 996 F.2d. 200 (8th Cir.1993). When a plaintiff produces direct evidence, such as statements by decisionmakers clearly showing that race was a motivating factor in the employment decision; or at least significant circumstantial evidence showing a specific link between the discriminatory animus and the challenged employment decision, the burden-shifting standards established by *Price–Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), come into play. *Stacks v. Southwestern Bell Yellow*

*Pages,* 996 F.2d. at 201 n. 1; *Beshears v. Asbill,* 930 F.2d. 1348, 1353 (8th Cir.1991). In the absence of such evidence, the guidelines set forth in *McDonnell–Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) are applicable. *Stacks v. Southwestern Bell Yellow Pages,* 996 F.2d. at 202; *Johnson v. Minnesota Historical Society,* 931 F.2d. 1239, 1242–43 (8th Cir.1991); *Halsell v. Kimberly–Clark,* 683 F.2d. 285, 289 (8th Cir.1982), *citing, Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981), *cert. den.,* 459 U.S. 1205, 103 S.Ct. 1194, 75 L.Ed.2d 438 (1983).

The defendant denies that plaintiff's race negatively influenced the decision to demote plaintiff.[13] Plaintiff believes otherwise and that his evidence directly supports this belief; consequently, he contends that the *Price Waterhouse* test is applicable.

If a plaintiff can produce evidence which demonstrates that an illegitimate criterion (in the present case, race) was a motivating factor in the challenged employment decision, then the burden-shifting framework of *Price Waterhouse* is applied. Under *Price Waterhouse,* once the plaintiff establishes that the illegitimate criterion was a motivating factor in the challenged employment decision, the burden of persuasion shifts to the defendant employer to show that it would have made the same decision absent the illegitimate criterion. *Stacks v. Southwestern Bell Yellow Pages,* 996 F.2d. at 202; *Beshears,* 930 F.2d at 1353. The *Price Waterhouse* burden shifting only applies "when there truly are mixed motives: when the company has a valid interest *and* there is evidence of discrimination as a motivating factor in the decision." *Stacks v. Southwestern Bell Yellow Pages,* 996 F.2d. at 202, *citing, Price Waterhouse,* 490 U.S. at 260, 109 S.Ct. at 1795–96.

The Eighth Circuit Court of Appeals has specifically addressed the issue of what constitutes direct evidence sufficient to meet the plaintiff's burden under *Price Waterhouse.* In *Beshears, supra,* the Court noted that such evidence does not include "stray re-

---

**13.** Cutting and Kester testified that plaintiff's race was only a consideration in that demotion was offered to plaintiff, instead of termination of his employment.

marks in the workplace", "statements by nondecisionmakers", or "statements by decisionmakers unrelated to the decisional process itself". *Id.,* 930 F.2d at 1354 *quoting Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. at 1804; *Stacks v. Southwestern Bell Yellow Pages,* 996 F.2d. at 202. The *Beshears* Court went on to note that such evidence may include "evidence of actions or remarks of the employer that reflect a discriminatory attitude" and "[c]omments which demonstrate a discriminatory animus in the decisional process, or those uttered by individuals closely involved in employment decisions". *Id.,* 930 F.2d at 1354 *quoting Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. at 1804–05; *Stacks v. Southwestern Bell Yellow Pages,* 996 F.2d. at 202–03. Thus, the plaintiff's burden is to produce evidence (of statements, comments, actions) which demonstrate a causal relationship to the challenged employment decision. *Sargent v. Paul,* 16 F.3d. 946, 948 (8th Cir.1994).

■ Plaintiff's "direct" evidence that race was a motivating factor in the decision to demote him is primarily directed towards Brank's alleged threats of physical harm and a racial slur. Plaintiff contends that the alleged verbal abuse and racial slur, as well as alleged hostile treatment of other black employees, most notably Lionel Harris, was indicative of Brank's "discriminatory" attitude toward blacks. He contends that only he was the recipient of the verbal abuse, whereas other white employees, especially Tony Kern (RSM for Region III) did not receive such abuse. Defendant contends that even if Brank had directed threats of physical harm or a racial slur towards the plaintiff, such statements are immaterial because because Brank was not involved in the final decision to demote the plaintiff.

Plaintiff's evidence of alleged physical threats and a racial slur will be considered by the Court because the evidence, as a whole, clearly shows that Brank was closely involved in employment decisions concerning the plaintiff. He wrote the plaintiff's performance appraisals, placed the plaintiff on two performance tracks, accompanied higher ranking managers on market tours of plaintiff's area, and discussed plaintiff's managerial "shortcomings" with these same higher ranking managers.

Plaintiff's testimony was that Brank threatened him with physical harm on numerous occasions. He testified that Brank threatened him with loss of his job over "trivial" matters such as walking into a store in front of Brank or not looking at Brank during a meeting. Plaintiff also testified that Brank threatened to "tear his head off" several times. Plaintiff claims that Brank "reserved this hostility for Plaintiff, the only black Region Sales · Manager". Plaintiff's Post–Trial Brief, pg. 13.

These alleged threats were not witnessed by anyone other than the plaintiff. In his depositions, plaintiff refers only to two specific incidents in which Brank threatened him physically; i.e. a staff meeting occurring after September 1987 and a confrontation involving coffee plaintiff claims occurred in July 1988. Plaintiff's Deposition of February 15, 1993, pg. 29; Plaintiff's Deposition of March 10, 1993, pg. 24. He refers to three events specifically in his letter to Kester in February 1988 and in general to being physically threatened (by Brank) three times during the preceding nineteen (19) months in his rebuttal to his 1988 evaluation. Defendant's Exhibits O and EEEE. The three events referred to in his letter to Kester are the staff meeting which he now states occurred in August 1987, the coffee incident which he now states occurred in October 1987, and an incident involving the Queen stores. At trial, plaintiff testified to several incidents involving physical threats: August 1987—entering a store ahead of Brank; August 1987—arriving late for a meeting with Brank; October 1987—refusing to get Brank coffee; November 1988—staff meeting; and several instances where Brank allegedly threatened him with the loss of his job. Kester testified that at the meeting of March 23, 1988 (in response to plaintiff's letter of February 1988) Brank admitted to threatening to "tear the plaintiff's head off" on one occasion.

The afore-mentioned "coffee incident" is also the only alleged instance of the use of a racial slur with regards to the plaintiff. As stated before, Gipson testified at his deposition that in July 1988 Brank called Gipson a

"racial epithet", he fails to disclose the name or term utilized by Brank. At trial, Gipson first testified on direct that the name-calling occurred in July 1988, but on cross-examination, he changed the date to October 5, 1987. He testified that on the morning of October 5, 1987 he encountered Brank standing in the doorway of plaintiff's office. Brank asked the plaintiff where some coffee was and plaintiff replied that there was some coffee in the conference room. Brank asked where in the conference room and plaintiff replied in one of two drawers in a credenza and returned to looking at papers on his desk. Plaintiff then testified that Brank got angry and entered plaintiff's office, slamming the door behind him. Plaintiff testified Brank stated "I arrive here and no coffee is made, what is your problem, you sit there like a dumb nigger. I ought to rip your head off". Plaintiff claims that he told Brank fine, that Brank had been on his case since coming to St. Louis, and to let's just get it over with now. Plaintiff then testified Brank simply turned around and left plaintiff's office.

Plaintiff testified that, although he was seated at his desk throughout this confrontation, he was aware of two people in the common area outside his office who witnessed this incident. Plaintiff's witness, Richard Daniels, testified that he overheard the "coffee confrontation" from the hallway outside of plaintiff's office; however, he was unable to give the date of the incident. He testified that Brank kept asking plaintiff where the coffee was kept and that plaintiff kept answering him. He further testified that Brank got angry and called Gipson a "insubordinate little nigger". He further testified that Gipson got up from his desk and slammed the door shut. Daniels testified that he related the incident to Pat Miller. Finally, Daniels testified that he was never asked by anyone to give testimony or provide an affidavit to the EEOC regarding this alleged incident. Charles Kester testified that Pat Miller never told him that Daniels had reported Brank using a racial slur in connection with the plaintiff. Kester also testified that Daniels never reported to him the use of any racial slur by Brank or anyone else.

There is absolutely no mention of threats of physical harm or the use of any racial slur in plaintiff's EEOC charge, his affidavit accompanying the EEOC charge, or in the EEOC Pre–Determination Interview. Defendant's Exhibits ZZZ, BBBB, and DDDD. Katherine Luther Compton, the EEOC investigator, who took down the affidavit of the plaintiff testified that if the plaintiff had said anything about physical threats or racial slurs, it would absolutely be noted in the affidavit.

Finally, Kester and Cutting both testified that despite numerous meetings with the plaintiff, he never once said anything about Brank using a racially derogatory term to him. Both men testified that plaintiff made general statements about discrimination but consistently failed to provide any examples of same. Plaintiff testified that he did not specifically tell Kester or Cutting (or anyone else) about Brank's racial slur because he found it so offensive.

Robert Patterson testified that as one of Gipson's DSMs he regularly observed Brank's treatment of Gipson. He had no recollection of any specific events or incidents of hostility between the two.

The Court finds that the evidence is credible only as to one incident occurring prior to February 1988 in which Brank threatened the plaintiff verbally with physical harm. As to the alleged racial slur, the Court finds this allegation unsubstantiated. There simply is no external evidence to support the allegation. Plaintiff's only witness to the alleged "coffee confrontation", Rich Daniels, admitted that he had been reprimanded several times by Brank. He could not recall the month or year of the incident. His account of what occurred is different from the plaintiff's account. He claims he told only Pat Miller about the incident, yet not the plaintiff. It wasn't until he was contacted by the plaintiff's attorneys that he told the plaintiff of what he allegedly overheard. The plaintiff never told anyone about the incident despite numerous opportunities to do so. Despite a detailed letter of complaint to Kester in February 1988, there is not a single reference to the alleged racial slur. Finally, there is not a

**1578**

single reference to a racial slur in any of the documents he filed with the EEOC.

"Not all comments that reflect a discriminatory attitude will support an inference that an illegitimate criterion was a motivating factor in an employment decision." *Stacks v. Southwestern Bell Yellow Pages,* 27 F.3d. 1316, 1324 (8th Cir.1994) *quoting Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d. 444, 449 (8th Cir.1993). Plaintiff claims that only he was the recipient of threats, not the other white RSMs. However, the testimony adduced at trial from a variety of witnesses (black and white) was that Brank was a difficult person to get along with and had a very abrasive style of interacting with people. Tony Kern, the white RSM singled out by the plaintiff, testified that once he came to St. Louis to replace plaintiff, supervision under Brank became so stressful, he had to be hospitalized. Even accepting the fact that Brank threatened plaintiff with "tearing his head off" on at least one occasion, this single isolated instance of a verbal threat of physical harm does not show a specific link between racial discrimination and the demotion. *Stacks,* 996 F.2d. at 201, n. 1. Plaintiff's only other "evidence" is unsupported allegations that Brank made vague comments regarding the questionable nature of plaintiff's future with the company. Finally, plaintiff's evidence of reprimands by Brank is severely undermined by the fact that these "reprimands" were not written in a hostile manner, in fact they often included polite requests by Brank that plaintiff discuss the problem at hand with Brank or take steps to rectify the situation. Furthermore, plaintiff may have received reprimands from Brank, but he was also the recipient of numerous memoranda complimenting him on his efforts. At best, plaintiff's evidence shows only a difference in attitudes between the two men and fails to show that Brank's "attitude" had a causal relationship to plaintiff's demotion. *See, Sargent v. Paul,* 16 F.3d. 946, 948–49. Given the foregoing, the Court determines that the *Price Waterhouse* burden-shifting analysis is inapplicable to the present case and chooses to proceed under the application of the burden-shifting framework of *McDonnell–Douglas.*

*McDonnell–Douglas, supra,* established a three-part analysis for Title VII disparate treatment cases. Under *McDonnell–Douglas,* a Title VII plaintiff must first establish a *prima facie* case of intentional discrimination by a preponderance of the evidence. If the plaintiff successfully establishes a *prima facie* case of intentional discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment action. If the defendant employer meets this burden of production, the plaintiff employee must show by a preponderance of evidence that the articulated reason(s) for the challenged employment action are pretextual and that the illegitimate criterion was the motivating reason. At all times the plaintiff employee possesses the ultimate burden of proving to the Court that s/he was the victim of intentional discrimination. *St. Mary's Honor Center v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Favors v. Fisher,* 13 F.3d. 1235, 1237–38 (8th Cir.1994); *Webb v. Missouri Pacific R. Co.,* 826 F.Supp. 1192, 1211 (E.D.Ark.1993).

In establishing a *prima facie* case of intentional discrimination, Gipson must produce sufficient evidence to support an inference that he was demoted from his RSM position to a DSM for discriminatory reasons. *Williams v. Ford Motor Co.,* 14 F.3d. 1305, 1308 (8th Cir.1994); *Favors v. Fisher,* 13 F.3d. 1235, 1237 (8th Cir.1994). The threshold of proof required in establishing a *prima facie* case is "minimal". *Johnson v. Arkansas State Police,* 10 F.3d. 547, 551 (8th Cir.1993). "The elements necessary to establish a prima facie case vary according to the circumstances of the alleged discrimination." *Favors v. Fisher,* —— U.S. at ——, 113 S.Ct. at 1237 *quoting Jones v. Frank,* 973 F.2d. 673, 676 (8th Cir.1992); *see also Williams v. Ford Motor Co.,* 14 F.3d at 1308. In the present case, plaintiff's contention is that he was demoted discriminatorily because Region 3's white RSM (Tony Kern) was not subjected to the same standards as was defendant. In light of the basis for the plaintiff's claim, in order for Gipson to establish a *prima facie* case for discriminatory demotion based on race, he must establish 1) he is a member of a protected class; 2) he had the

requisite qualifications for the Regional Sales Manager position; 3) he was demoted from Regional Sales Manager to District Sales Manager; and 4) similarly situated employees outside his protected class were not subject to the same demotion. *See, Jones v. Frank, supra.* In determining whether employees are "similarly situated", the Court should consider whether the employees are subject to the same conditions or accused of the same or similar conduct, yet are disciplined in different ways or subject to a different employment action. *See, Williams v. Ford Motor Co.,* at 1309.

Plaintiff without a doubt satisfies the first three elements because he is an African–American who was initially qualified for his position as a Regional Sales Manager but was demoted to District Sales Manager. It is the last element which poses a problem.

Plaintiff's main argument is that he was demoted even though his regional sales forecast and his regional selling expense forecast were better than those of Kern. Essentially, his claim is that race had to be the primary factor for his demotion because he consistently "outperformed" Kern.

The evidence shows that Gipson and Kern had the same job description. Plaintiff contends that Brank demanded more "route riding" from his DSMs, demanded more "workwiths" by plaintiff, and forbid him from hiring route salespersons without Brank's prior approval; yet did not make the same demands of Kern. Kern testified that Brank told him the number of account calls he had to make were no less than one per month, or bi-monthly. He testified that Brank urged him to route ride weekly if possible, but try for twice a week. He further testified that he was directed to encourage his DSMs to route ride with their route salespersons. Finally, he was allowed to hire route salespersons without Brank's prior approval.

The evidence undeniably shows that Region 2 and Region 3 are vastly different marketing areas that affect the way personnel perform. Plaintiff's region (Region 2) is a large metropolitan marketing area covering Illinois and Missouri. Cutting testified that in St. Louis alone, there are 5 to 6 major accounts serviced by defendant's St. Louis personnel. Travel between these accounts may only take anywhere from fifteen (15) to thirty (30) minutes. Region 2 is headquartered in St. Louis and all personnel for the region work directly out of the St. Louis office. Product is stored and inventoried in a central warehouse in St. Louis.

On the other hand, Tony Kern's region (Region 3) is a largely rural marketing area covering seven states. Cutting testified that account calls were generally twenty (20) to thirty (30) miles apart, with the major accounts being approximately one-hundred (100) miles apart. Region 3 is headquartered in Farmington, Missouri with some personnel working out of that office, others generally "out in the field". Personal contact between Kern and his subordinates was not a daily experience due to the expansiveness of the region. There was no central warehouse operation for product inventory; most route salespersons kept inventory on hand either at home or in "bins" (individualized inventory storage lockers). Contact between Kern and Brank was mostly by telephone.

The evidence shows that plaintiff had daily direct contact with his DSMs, and his DSMs had direct supervision of their route salespersons. The evidence also shows that the standards for "route riding" and "workwiths" had been in place for a long period of time, yet emphasis on them was greatly increased once defendant was purchased by Borden. The evidence also shows that enforcement of these standards was beefed up once Brank became Division Sales Manager. It is also clear that applying these standards is greatly affected by the logistics of the sales regions. Although Kern was expected to meet the same standards as plaintiff, the expansiveness of his region and the inability to have direct daily contact with subordinates (and still travel long distances for account calls) required some flexibility. The uncontroverted evidence shows that direct supervision was not impeded by the logistics of plaintiff's region. The evidence shows that the responsibilities of the two men differed, despite the same job descriptions, due to the geographics of their regions. Region 2 had a central warehouse for product inventory and

distribution; plaintiff was responsible for its daily operation. Region 3 did not have a central warehouse for product inventory and distribution; consequently, Kern did not have any responsibilities regarding warehouse operations.

The difference in applying the standards set for "route riding" and "work-withs" was not due to the different races of Gibson and Kern. The evidence shows that enforcement of the standards varied due to the inherent difference between the two regions as regards the impact of the geographics on direct supervision of subordinates. The evidence further shows that while on paper plaintiff consistently had higher sales than Kern, more money was spent in Region 2 than Region 3 by Brank which had a direct positive impact on plaintiff's sales figures.

The Court finds that plaintiff was not "similarly situated" to Kern and thus, plaintiff's evidence is not sufficient to raise an inference of race discrimination.

■ Assuming arguendo, that plaintiff and Kern were "similarly situated" and that plaintiff's evidence was sufficient to raise an inference of race discrimination, the Court still finds that plaintiff has failed to prove that the defendant engaged in purposeful race discrimination when it demoted him to DSM.

Once Gipson establishes a *prima facie* case, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for its decision to demote Gipson. This burden is one of production, not proof. *White v. McDonnell Douglas,* 985 F.2d. 434, 436, citing *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1973). Defendant has to provide a "clear and reasonably specific" explanation for the challenged employment action, but it does not have to prove to the Court that it was motivated by the explanation given. *White,* 985 F.2d at 435–36, citing *Burdine,* 450 U.S. at 254–258, 101 S.Ct. at 1094–96. Defendant asserts that the decision to demote plaintiff resulted from the plaintiff's refusal to perform his managerial duties in accordance with the defendant's policies and practices. Due to an increasingly competitive snack food market, Borden believed

that aggressive "hands-on" management was necessary to at least retain, if not increase, Borden's share of the market. Despite repeated management directives to bring the number of "work-withs" and "route rides" in his region up to defendant's standards, plaintiff failed to do so. Plaintiff failed to regularly service major accounts in accordance with the company's "3–Part" selling approach. He resisted implementing personnel changes as directed by his supervisor. He resisted implementing warehouse operation changes as directed by his supervisor. He resisted carrying out the objectives of his Personal Development Program. Plaintiff's continuing resistance to implementing the sales and management techniques mandated by his supervisor in carrying out defendant's policies is a legitimate reason for the defendant to demote the plaintiff to a lower level of responsibility.

Since defendant has articulated a legitimate, non-discriminatory reason for its decision to demote the plaintiff, Gipson has the "opportunity to demonstrate that the proffered reason was not the true reason for the employment decision", or in other words, to prove pretext. *Williams v. Ford Motor Co.,* 14 F.3d at 1309; *Favors v. Fisher,* —— U.S. at ——, 113 S.Ct. at 1237 *quoting Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. Gipson argues two points in his endeavor to prove pretext. First, he argues that his performance record was superior to Kern, yet Kern was never reprimanded or demoted. He contends that Kern's region had less sales and more stales, and rarely met company standards regarding "work-withs" and route riding, yet Kern was never disciplined.

As the Court has already noted, Kern's region and Gipson's region are vastly different in logistics which significantly impacts on sales and management techniques. Kern and Cutting testified that while Kern did not always meet company standards as to "work-withs" and route riding, actual numbers were reported and records show that Kern was consistent in his attempts to meet these standards. The records show that in the plaintiff's region, his numbers were always below standard. Furthermore, plaintiff testified that his reported numbers were not accurate

because he reported "pulling an open route" [14] as route riding. Cutting testified that in recognition of the differences between the two regions, the sales plans for each region was tailored specifically for that region. However, Cutting further testified that in order to meet the competitive market in the St. Louis region, Brank spent a great deal more money in Region 2 than Region 3 which was directly reflected in the "better" sales performance numbers for Region 2 than Region 3.

Kern testified that (while he was the RSM for Region 3) Brank never issued him a written reprimand, never threatened to "tear his head off", never insinuated that his job was in jeopardy, and never placed him on a "personal development plan" or on probation. He also testified that as the Region 3 RSM he did not have daily "face to face" contact with Brank, instead communicating with him on a regular basis by phone. He testified that Brank was a "difficult" man to work for, and that after he was transferred to St. Louis to replace Gipson, he found Brank to be more "demanding" since they had daily contact.

Plaintiff attempts to further prove pretext by comparing Kern's tenure as the RSM in St. Louis to plaintiff's performance as the RSM in St. Louis.[15] Plaintiff attempts to show that Brank demanded less from Kern as the RSM in St. Louis than he did of the plaintiff. He contends that Brank did not demand the same number of "work-withs" or same level of route riding from Kern, and did not reprimand him for failing to meet these numbers. He further contends that Kern

did not have warehouse responsibilities when he was the Region 2 RSM.

The credible evidence shows that after plaintiff was demoted, Region 2 was left without a RSM for at least two to three months, at which point Gary Bruner was appointed the RSM. The Court determines that any evidence adduced regarding Bruner's term as the Region 2 RSM is irrelevant since plaintiff has chosen to compare himself primarily with Kern. Plaintiff's witness Rich Daniels testified that he did not do any "work-withs" with Kern; however, Kern testified that this was not true. The evidence shows that Daniels was one of the poorest performing DSMs under plaintiff's control when plaintiff was the Region 2 RSM. He quit his DSM position while Kern was the RSM for Region 2. Kern testified that he had had problems with Daniels in that Daniels would often disappear for long periods of time without informing management of his whereabouts and that Daniels' stores were not up to company standards. The Court finds Kern's testimony to be the more credible testimony. Plaintiff's other witness, Robert Patterson, testified that he could only recall one "work-with" with Kern when Kern was the Region 2 RSM. Kern testified that Patterson had an "attitude" problem which was noted on a job performance evaluation. He also testified that he had done more than one "work-with" with Patterson while he was the Region 2 RSM. The Court finds Kern's testimony more credible.

The evidence further shows that Kern, for a long period of time, was the RSM for both Regions 2 and 3. He testified that during this period of time it was extremely difficult

---

**14.** "Pulling an open route" refers to a DSM servicing a route left open by the absence of a route salesperson due to illness, vacation, etc. Route-riding refers to the supervisory practice of a DSM accompanying a route salesperson on his or her route to make sure the route salesperson is performing duties adequately. *See also*, footnote 12.

**15.** A great deal of evidence was adduced at trial, primarily by the plaintiff through his own direct examination and the cross-examination of defendant's witnesses, of events that occurred after the plaintiff was demoted and filed his EEOC charge. This evidence included a number of changes in management consisting of Kern's tenure as the

Region 2 RSM, the replacement of Brank as the Divisional Sales Manager by Herbert Johnson (a black male), Kern's demotion to DSM by Johnson, and a severe reprimand in 1990 to plaintiff for displaying an openly hostile attitude toward the company at a management meeting. Even though the Court had previously ruled that plaintiff's claim only extended up to the time at which he filed his EEOC charge, the parties' were so intent on introducing this post-EEOC charge evidence to support their respective positions, the Court allowed it to be admitted into the record. However, although the Court considers this evidence to be of some relevance to the claim at issue, it does not accord this evidence any great weight.

to meet the standards as required in Region 2. At one point in 1991, while he was calling on all of the major accounts in Regions 2 and 3 in addition to some other smaller accounts, he entered a hospital for stress and depression. There was also evidence adduced that during this change in management, warehouse operations also changed. Although no one testified as to the impact changes in warehouse operations had on the responsibilities of the Region 2 RSM, it is quite plausible to believe that Kern was relieved of this responsibility given the fact that he was managing two regions simultaneously.

Plaintiff has failed to prove, by comparing himself to Kern, that defendant's reason for the demotion is a pretext for racial discrimination.

■ Plaintiff then attempts to prove pretext by claiming that Brank's "lies" and "unwarranted" reprimands were the moving force behind the decision to demote him. He avers that Brank's "bigoted" attitude caused the confrontations, that he was constantly victimized by Brank, and Brank's ultimate goal of getting rid of the plaintiff was by persuading upper management that plaintiff was unsuitable for the RSM position.

The Court has already found plaintiff's claim that Brank called him a "nigger" to be unsupported by any external evidence, thus, lacking credibility. Since Brank's testimony regarding events testified to by Gipson was not offered by either party, the Court must look at other sources to gain insight into the man's relationship with his managers, including the plaintiff, in order to assess plaintiff's claim that he, and he alone, was the "innocent victim" of Brank's constant barrage of verbal abuse.

The evidence established conclusively that Brank was a "demanding" supervisor. When Borden bought defendant, it immediately set out to attack an increasingly competitive snack food market in an aggressive manner. It wanted its managers to supervise field personnel directly, i.e. regular personal contact. It wanted its managers out of their offices and in the field checking up on the lower-level managers and route salespersons. It established a specific "3–Part" selling system to make sure clients were getting what they needed in order to sell KAS products. The evidence clearly showed that the snack food market in St. Louis was especially competitive and Brank carried out Borden's policies in an aggressive manner with regard to the St. Louis market.

This was not the type of management style that Gipson had worked under for a number of years with the previous owner. In the past plaintiff's management methods did not extend to the same level of direct supervision that Brank demanded on Borden's behalf. The evidence shows that most of the confrontations were simply a conflict between management styles.

The multitude of memoranda sent by Brank to Gipson, as well as by Gipson to Brank, demonstrate a constant tugging at plaintiff to get him to respond to the new more aggressive approach to marketing KAS products. The Court has no doubt that plaintiff is a hard-working individual sincere in his belief that he was doing his job in an acceptable manner. Yet regardless of what he felt was acceptable is not really up to him to decide. As defendant's employee he is obligated to perform his duties in accordance with company policy as directed by his supervisor. The memoranda demonstrate a supervisor who had to constantly remind his manager of company standards, who pleaded with his manager to start doing things the "Borden way", and who admittedly became exasperated by his manager's blatant resistance to change. The evidence also shows that the men who made the final decision to demote the plaintiff did not simply go along with Brank's "decision" to demote plaintiff, but rather had personally met with plaintiff a number of times and had personally done market checks of stores in plaintiff's region. Without a doubt Cutting, Kester, and Miller gave strong consideration to Brank's opinion since he was plaintiff's immediate supervisor; however, they had also done their own investigation into the situation and considered not only what Brank had to say but also what they had personally observed in making the decision to demote the plaintiff.

The Court gives little credence to plaintiff's testimony as to how Brank treated him

for the simple reason such testimony is totally subjective and unsupported by external evidence. Plaintiff claims all of Brank's criticism and reprimands were completely unwarranted, but this is not the case. Plaintiff did sell stale product to a charitable organization, he did not comply with company standards regarding route riding and "work-withs", he did delegate tasks to others that he was supposed to carry out himself, stores in his region were found to be poorly serviced, and he did fail to service major accounts using Borden's "3-Part" selling system. The evidence shows that plaintiff was always quick to justify or find an excuse for the deficiency, but never willing to take responsibility for his actions. An example of this are the incidents involving the personal development programs. In October 1987 Brank presented plaintiff with a six-month plan of specific objectives to meet in an attempt to help plaintiff overcome some deficiencies noted by Brank in plaintiff's job performance evaluation. Plaintiff immediately rejected the notion that his performance was deficient in any manner and complained to Kester that the evaluation was biased. Meanwhile, he only half-heartedly tried to meet the objectives set down in the six-month plan. In 1988, when Brank drafted a very specific personal development program for plaintiff (at Cutting's suggestion), plaintiff completely dismissed it. Despite the fact that he was told it was developed specifically to help plaintiff improve his job performance and the plan clearly sets out objectives, a time-table to meet these objectives, and emphasizes the need of plaintiff to address these objectives, Gipson ignored the plan and later told Brank he thought it was strictly "voluntary" on his part. These incidents clearly demonstrate to the Court that Gipson tended to create his own problems by refusing to accept Brank's authority and by resisting any directive to change to his management style in order to do things the "Borden way".

Plaintiff's attempts to portray Brank as a "bigot" by his interactions with black employees also fail to support his claim. The evidence shows that no one escaped Brank's wrath regardless of the color of skin. Assuming that he did in fact refer to Lionel Harris as "the fat black guy with glasses",

the Court hardly views this statement as clearly indicative of a racist mindset. Brank had just joined the company and it is reasonable to believe that he was not yet familiar with everyone's name. The statement does refer to Harris as being black but the only "derogatory" nature of the statement might be in reference to his weight. Although Brank could be at times critical of Harris' job performance, he recommended Harris for a RSM position in 1989-90. Greg Vaughn, a black warehouse worker for the defendant, testified that he really never liked Brank and felt that Brank did things behind plaintiff's back in order to "embarrass" plaintiff. However, in the fall of 1988 Brank recommended Vaughn as the lead foreman (at the warehouse). Kester negotiated the position with the Union and got it approved. In December 1988, Brank issued a memoranda very complimentary of Vaughn's efforts to keep warehouse inventory levels down and managing the daily operation of the warehouse in an efficient manner. Brank was especially critical of two white DSMs—Carmack and Zavorka. At one point, he put Zavorka on a performance track due to continuing poor job performance.

The Court does not believe that it should judge Brank's job performance evaluations and criticisms of plaintiff's management techniques as to whether or not they were "warranted". Such evaluations and remarks are based upon personal observations and interpretations, i.e. subjective criteria. The Court's duty is not to decide if Brank was the "best" supervisor. It is only for the Court to decide if Brank displayed an attitude of racism which motivated his scrutiny of the plaintiff and was the catalyst for plaintiff's demotion. The parties offer numerous memoranda authored by Brank as a window into his psyche. Plaintiff believes these demonstrate a racial bias on the part of Brank which motivated the demotion decision. They do not. Brank's 1987-88 job performance evaluation of Gipson, which Gipson hotly contested, was found not to be grossly inaccurate. Plaintiff claimed that Schnuck and National never requested that he be taken off their accounts as Brank claimed they had done. Testimony at trial by the buyers for

Schnuck and National revealed that six (6) years later, these witnesses could not recall exactly whether or not they had made such requests, but did admit that plaintiff did not provide the best service for them, that he did tend to "bullshit" (as did many food representatives), that he did fail at one time or another to timely present promotional information. Plaintiff was not the recipient of only "hostile" memoranda from Brank. He was complimented on a number of occasions by Brank when he carried out his responsibilities the "Borden way". Even the "hostile" memoranda submitted by the plaintiff fail to reflect the violent, raging persona he has drawn of Brank. They do criticize plaintiff for certain managerial shortcomings; however, it is constructive criticism offered in a non-derogatory manner. Often these memoranda contained offers of assistance to the plaintiff in meeting the company's expectations. There is nothing in them which reflects a discriminatory attitude by Brank. Often plaintiff's interpretation of these memoranda were the extension of plaintiff's own hostility. Illustrative of this fact is Gipson's reaction to two memoranda issued by Brank in November 1988. Brank sent a memorandum to Gipson and Kern requesting them to carry out a "sales audit" as directed by upper management. Gipson, instead of carrying out the directive, sent the Brank memorandum to his DSMs characterizing it as one more thing Brank wanted them to do. A second memorandum was sent to all of the RSMs requesting that in the future the weekly status reports should have certain additional information. Gipson sent out a copy of this memorandum to his DSMs with a cover letter accusing Brank of wanting another report which Gipson considered unnecessary.

After considering all the evidence and all the testimony, the Court concludes that plaintiff has failed to show pretext and that the decision to demote him was racially moti-

vated. Whatever difference in treatment was accorded to Kerns was necessitated by the differences in the logistics of the two regions and by Kerns' unique situation of covering both regions following the plaintiff's demotion. "Different treatment does not necessarily establish disparate treatment". *Mann v. Frank,* 795 F.Supp. 1438, 1453 (W.D.Mo.1992), *aff'd* 7 F.3d. 1365 (8th Cir. 1993). Although Brank and Gipson may have had an acrimonious relationship, it was not due to racial bias but rather to an increasingly intense personality conflict. The relationship became defensive and adversarial primarily because of plaintiff's attitude. Defendant made a business decision based upon observations and discussions involving several individuals knowledgeable of the situation. *See, Charles v. Allstate Ins. Co.,* 932 F.2d. 1265 (8th Cir.1991) (plaintiff's combative attitude, not race discrimination, was motivating factor for discharge). It may not have been a decision to the plaintiff's liking, but given the alternative of outright discharge, it appears to be a reasonable business decision which accommodated the defendant's business concerns and considers the plaintiff's long employment history. *See, Crittendon v. Columbia Orthopaedic Group, et. al.,* 799 F.Supp. 974 (W.D.Mo.1992). More importantly, the Court fails to find any credible evidence which proves the decision to be racially motivated.

For the foregoing reasons, the Court enters judgment in favor of defendant and against the plaintiff on the merits of the plaintiff's complaint.